# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| United States of America, | Case No.: 2:18-cr-00374-JAD-CWH |
|                Plaintiff | |
| v. | |
| Lashawn Hicks, | **Order Denying Defendant's Motion to Suppress** |
|                Defendant | [ECF No. 24] |

On an evening in October 2018, two Las Vegas Metropolitan Police Department officers began investigating a car that lacked a visible handicapped-parking placard[1] but was parked in a handicapped-parking spot at an extended-stay motel in a high-crime area that the officers patrol nightly. Two adults were sitting in the car with music "blaring": a woman in the driver's seat and Defendant Lashawn Hicks, who sat in the front passenger seat with part of his body hanging out the open door. After the officers ordered the two to step out of the car, they ran records checks and discovered that the driver had a suspended license and a prior narcotics arrest or conviction, and that Hicks had prior arrests or convictions for robbery and battery with a deadly weapon. And the officers suspected that Hicks had a gang history, which he confirmed.

Because neither the driver nor Hicks had a valid driver's license and therefore couldn't legally move the car, the officers began writing the driver a citation for illegal parking. Before completing the citation, the lead officer announced that his partner would "frisk" the car for weapons. As the patdown began, Hicks revealed that there was a gun in his suitcase in the car's

---

[1] I recognize that the term "handicapped parking" is outdated and grammatically incorrect. But because both parties and the Nevada statute at issue use the term, I apply it here to avoid confusion. No offense is intended.

backseat.  The officers located the revolver and, based on Hicks's prior felony conviction, arrested him for being a felon in possession of a firearm—the charge on which he is currently being prosecuted.

Hicks moves to suppress his statement and the gun, highlighting the aspects of this investigation that—I admit—strike me as overkill for a parking infraction.  But after filtering the officers' body-camera footage and suppression-hearing testimony through the web of car-stop case law, I find that each stage of their investigation was constitutionally sound.  I thus deny Hicks's motion to suppress.

## Background[2]

Officers David Nesheiwat and Joshua Griffith are partners serving on Metro's Nora Safe Street Team, a unit (according to their testimony) dedicated to establishing a stronger police presence in "high crime areas" suffering from high rates of violent crimes, drug, and gangs.  Rather than primarily responding to emergency calls, Safe Street officers focus on crime prevention by patrolling their assigned areas for anything out of the ordinary.  Nesheiwat and Griffith are assigned to the South Central Area Command, an area adjacent to the Las Vegas Strip that runs North to South roughly from Sahara Avenue to McCarran Airport and East to

---

[2] Many of these facts are drawn from the officers' bodycam footage, which I reviewed carefully and repeatedly.  Because there are two separate cameras that turned on and off at different points during the stop, and the footage was broken into separate files, constructing a linear timeline was difficult.  But it was not impossible.  I repeatedly reviewed the footage before and after the evidentiary hearing, carefully matched up the timestamps in each video, and supplemented any gaps with the officers' testimony, which I deem credible.  All time citations in this order are to the timestamps in the upper righthand corner of the bodycam footage.  Neither officer's bodycam is set to the correct time of day, but both bodycams are almost synchronized to each other, with about a seven-second timestamp differential.  *See, e.g*, *infra* note 24 (each officer's bodycam capturing Officer Nesheiwat saying "your license is suspended" at slightly different timestamps); *infra* note 33 (each officer's bodycam capturing Keleigh Morris telling Officer Griffith that Officer Nesheiwat just informed her that her license is suspended).

West from Eastern Avenue to Paradise Road.  The officers spend most of their 5 p.m. to 3 a.m. shift patrolling a one-to-two block radius around the Emerald Suites on Paradise and Twain, the extended-stay motel where they encountered Hicks.  The officers drive their marked patrol car through the Emerald Suites parking lot several times a night, commonly speaking with the property's management and security, as well as individuals walking around the area.  Griffith testified that he and his partner do this to get to know the residents in order to help detect anything abnormal.

On this night, Nesheiwat and Griffith pulled into the Emerald Suites parking lot at nearly 9:30 p.m.  The events immediately following the officers' arrival were not caught on either officer's bodycam, because (as Griffith testified) Metro's policy requires officers to turn on their bodycams only when they speak with a suspect and only as soon it is safe to do so.[3]  But both officers testified that they saw from their police cruiser a four-door sedan without a handicapped-parking license plate parked in a marked handicapped-parking spot with the car's nose facing into the stall.  Nesheiwat, who was driving the cruiser and likely had a better view of the sedan,[4] testified that he didn't see a placard in the sedan's review mirror as he pulled up behind it.  So, he parked a few feet behind the sedan (perpendicular to its back bumper) and both officers exited the police cruiser.  Nesheiwat approached the driver's side and Griffith walked to the right

_____

[3] Hicks included Metro's written bodycam policy as an exhibit in his suppression-hearing binder but did not move to admit it into evidence.  Nor has he cited any portion of the policy that contradicts Griffith's understanding of it.  And when Hicks asserted during cross examination that Griffith violated the policy by not turning on his bodycam as soon as he approached the sedan, Griffith explained that he does not feel safe when approaching a suspect in a vehicle until after the suspect exits.  Although Hicks intimated during the suppression hearing that the lack of initial bodycam footage resulted from police misconduct, I find no basis for drawing any negative inference against the officers.

[4] Officer Nesheiwat was driving westbound through the parking lot, so the parked sedan was on his left.

3

passenger side.  Because there was lighting in the parking lot, Nesheiwat could see through the sedan's windshield and confirmed there was no handicapped-parking placard.  A woman was sitting in the driver's seat and identified herself as Keleigh Morris.  A young man—who the officers learned was Hicks—was in the front passenger seat with his body partially outside the open car door.[5]

The officers asked Morris whether she was allowed to park in a handicapped-parking spot, and she confirmed that she wasn't.  They then ordered Morris and Hicks out of the sedan.  Both officers testified that this is a common safety precaution during a traffic stop meant to limit access to potential weapons inside a car and was particularly prudent given their presence in a high-crime area.  The officers then split off; Nesheiwat spoke to Morris by the sedan's front door and Griffith spoke to Hicks, who stood in front of the cruiser with his hands on its front push bumper.  Neither Morris nor Hicks had identification, as Morris didn't have her driver's license, and Hicks (who reported he wasn't licensed to drive) didn't have an alternate state-issued ID.  But both provided the officers their names.

Nesheiwat turned on his bodycam after he began talking to Morris outside her car.  Although it is unclear how long the two had been speaking at that point, it is likely that Nesheiwat turned on the bodycam early in their conversation because the first audible

_____

[5] Although both officers testified that Hicks was not fully seated in the sedan, it is not clear whether he was hanging his legs out the side of the car or whether he was in the process of stepping out of the passenger seat.  Griffith also testified during cross examination that, when he approached Hicks, he didn't see Hicks reach for anything or hide anything in the car.  Conversely, Nesheiwat initially testified during direct that he saw Hicks bent over and "rifling through" a compartment in the car.  But when confronted during cross with the fact that Griffith gave contradictory testimony, Nesheiwat acknowledged that Griffith, who approached the front passenger door, had a better view of Hicks.  Based on this concession and the fact that Nesheiwat also candidly acknowledged that he didn't remember every detail of the stop (given the passage of nearly eight months and the number of traffic stops he makes), I conclude that neither officer saw Hicks rifle through a car compartment.

statements[6] appear to be questions that are fairly preliminary in any traffic stop: Morris cited two local cross streets—likely in response to the question of where she lives[7]—and Nesheiwat then asked her whether there were any weapons or narcotics in the car.[8]  At the same time, Hicks can be seen in the background of Nesheiwat's bodycam footage standing in front of the police cruiser, and Griffith then moved into frame from somewhere near Hicks and got into the cruiser's passenger seat.  Seconds later, Nesheiwat walked with Morris back to his cruiser, provided Griffith with Morris's full name, and remained standing just outside the cruiser's driver's door while Morris and Hicks stood around its hood.[9]

After a few seconds of silence, Nesheiwat asked Morris who the car belongs to, and she responded that it was registered in her husband's name.[10]  Morris then complained about being given a "hard . . . time," and Nesheiwat responded, "[I]f you'd like, I can give you a ticket.[11]  He also denied that he was purposefully causing Morris any problems, pointing out that she was

---

[6] There is a 30-second delay between the bodycams beginning to film and when the devices begin to also record audio.  Griffith testified that this is a standard feature of Metro's bodycams.

[7] Morris later gave Nesheiwat her full address.  Gov. Exh. 2 (File 13) at 4:41:50–58.  Because the proximity of an address to major cross streets is "a fact that is not subject to reasonable dispute," Fed. R. Evid. 201(b), I take judicial notice of the fact that the two streets Morris cited (Sahara Ave. and Lamb Blvd.) comprise the major intersection closest to the home address she provided.

It doesn't appear that Morris was staying at the Emerald Suites.  Nesheiwat testified that Morris reported that she had pulled into the parking lot to quickly pick somebody up and agreed to give Hicks, who was moving out of the Emerald Suites, a ride.  Griffith similarly testified that Hicks told him that he was moving out that night.

[8] Gov. Exh. 1 (File 10) at 4:24:40–50.

[9] *Id.* at 4:24:50–4:25.

[10] *Id.* at 4:25:10.  This question—which, too, seems like a preliminary inquiry in a traffic stop— also suggests that Nesheiwat did not question Morris for long before he turned on his bodycam.

[11] *Id.* at 4:26:15–34.

parked in a marked handicapped-parking spot and had music "blaring."[12]  Morris then

apologized, and Nesheiwat responded that "it's not that big a deal," but then stated, "If you'd

like, I could document it on a citation."[13]  After a few more moments of silence, Nesheiwat

asked Hicks where he was moving to, and Hicks responded, "Convention Center and Paradise,"

an intersection down the street from the Emerald Suites.  Nesheiwat replied that there's nothing

located at that intersection, but Hicks insisted that a Siegel Suites, another extended-stay motel

chain, is located there.[14]  Nesheiwat then shined one of the spotlights attached to the door of his

cruiser on Hicks's lower half and noted that Hicks had tattoos on the back of his hands.[15]

While Nesheiwat, Morris, and Hicks were having this exchange, which lasted about two-

and-a-half minutes in total, Griffith was running records check on both individuals through the

cruiser's Mobile Data Terminal (MDT).[16]  Griffith testified that this search revealed that Morris

had unspecified "priors" for drug crimes and a suspended driver's license and that Hicks had

priors for "violent crimes," including robbery and battery with a deadly weapon.[17]  Several

---

[12] *Id*.  Although no music was playing by the time the bodycam was turned on, Morris did not
quarrel with Nesheiwat's characterization of the volume level as "blaring."

[13] *Id*.

[14] *Id*. at 4:26:40–4:27:10.

[15] *Id*. at 4:27:20–26.

[16] During the evidentiary hearing, Hicks's counsel objected to the fact that the government had
not produced a printout of what reports Griffith ran on the MDT.  Government counsel
represented in response that Metro had not provided her a copy of the MDT report but that she
would produce it as soon as she received it.  Hicks's counsel implied that the MDT data may
have been lost due to government or police misconduct, citing to the ease in which they've
obtained the data in other cases.  I decided to proceed with the hearing because the officers were
present and any conclusion at that point as to why the data was not available would have been
premature and speculative.  To date, Hicks hasn't filed notice as to whether he received the data
nor filed a motion seeking any form of relief (beyond the pending suppression motion).

[17] On direct examination, Griffith initially stated that the "prior" was for robbery with a deadly
weapon but corrected himself on redirect after refreshing his recollection with the arrest report he

seconds after asking about Hicks's tattoos, Nesheiwat leaned into the cruiser and asked Griffith, "Everybody good?"[18] Griffith's response is inaudible, but he handed Nesheiwat a notepad that Nesheiwat briefly reviewed.[19]

Nesheiwat then asked Morris to speak with him and walked with her back over to her sedan several feet away.[20] He then asked, "Is there anything in the car I need to worry about? Drugs, narcotics, anything like that?" Morris responded no, and Nesheiwat then asked whether he could search the car. Morris again complained about "being given a hard time" and declined consent for the search. Nesheiwat then stated he was going to check whether she had a valid driver's license, and Morris said that she did. He then directed her to stand back in front of his cruiser. But after walking a few steps, Morris pointed back to her car and asked, "Can I move, can I leave?" Nesheiwat responded no and sat down in the cruiser's driver's seat.[21] While in the cruiser, Nesheiwat ran Morris's name through the DMV records to verify the status of her license to (as he testified) decide whether he needed to write a ticket or tow the car.

At the same time, Morris, Hicks, and Griffith stood around the cruiser's hood, with Hicks still in the center and Morris and Griffith on opposite sides. Griffith turned his bodycam on for the first time at this point, and when the audio kicked in 30 seconds later, Morris and Griffith were speaking across the hood about her daughter's age.[22] Griffith then turned slightly towards

---

wrote after arresting Hicks. And as highlighted during Griffith's cross examination, he did not seem to recall whether the background search revealed prior arrests or convictions.

[18] Gov. Exh. 1 (File 10) at 4:27:30–37.

[19] *Id.* at 4:27:37–46.

[20] *Id.* at 4:27:46–53.

[21] *Id.* at 4:27:53–4:29.

[22] Def. Exh. R (File 3) at 4:29:10–50.

Hicks and asked him where he's from.[23]  At the same moment, Nesheiwat briefly got out of the cruiser and called out to Morris, "Your driver's license is suspended."[24]

The conversations then split into two streams: Griffith continued to talk to Hicks, while Morris, standing in the same position, spoke with Nesheiwat, who had returned to the cruiser's driver's seat.  In response to Griffith's question, Hicks said he was moving from San Diego but was raised in Las Vegas.[25]  Griffith then asked Hicks what gang he was or used to be a member of, and Hicks responded "Gerson"[26]—as in the Gerson Park Kingsmen, a local gang named after a Las Vegas housing development.  Griffith, apparently familiar with the gang, responded: "So you're from the westside."  Several seconds later, Griffith asked Hicks whether he had a "G" or a "crown" tattooed on him and then immediately answered "yup" to his own question, spotting one of these two symbols on Hicks, who it sounds like also responded "yes."[27]

During this exchange, Nesheiwat and Morris were discussing her license.  She denied that it was suspended, stating that her "insurance [was] good."[28]  Nesheiwat confirmed Morris's full name with her and reiterated that her license was suspended.[29]  After Morris began talking about her insurance status with Nesheiwat, moving closer to his open driver's door, he told her to stand closer to the front of the cruiser next to Hicks.[30]  Nesheiwat then took out a parking-

---

[23] *Id*. at 4:29:51–53.

[24] *Id*. at 4:29:53–56; Gov. Exh. 1 (File 10) at 4:30:00–08.

[25] Def. Exh. R (File 3) at 4:29:53–4:30:04.

[26] *Id*. at 4:30:04–13 ("So, obviously you used to [gang]bang.  Who did you used to bang with?").

[27] *Id*. at 4:30:20–4:30:33.  It is likely that Griffith saw the specific tattoo on one of Hicks's hands because Hicks was wearing jeans and a long-sleeved sweatshirt, isn't seen on the video pulling up his sleeves, and doesn't appear to have any face or neck tattoos.  *See* Def. Exh. I.

[28] Gov. Exh. 1 (File 10) at 4:30:05–15.

[29] *Id*. at 4:30:15–22.

[30] *Id*. at 4:30:20–35.

citation form from his clipboard and began filling it out for Morris for illegally parking in the handicapped-parking spot.[31]  Nesheiwat explained during the hearing that the ticket wasn't for the suspended license because he never saw Morris drive her car.  He also clarified that he decided to issue a ticket at that point—when he had previously implied that he wouldn't write one[32]—because he now knew that Morris's license was suspended and that she therefore couldn't legally move her car.

As Nesheiwat began writing the citation, Morris turned to speak once again with Griffith across the cruiser's hood just as he finished asking Hicks about his gang affiliation and tattoo.[33] Morris then discussed the status of her car insurance with Griffith for about a minute.[34]  At that point, Nesheiwat called for Griffith to join him inside the cruiser, and Griffith sat down in the passenger seat.[35]  Both officers turned off their bodycams at this point, and they explained during the hearing that Metro's policy doesn't require the cameras to be on when officers are speaking to one another rather than to suspects.  Both officers turned their bodycams back on just over three minutes later.[36]  The record does not reflect what occurred during this gap because neither side questioned the officers about it.

---

[31] *Id*. at 4:30:30–4:31:44.

[32] *Id*. at 4:26:15–34 (Nesheiwat saying to Morris: "If you'd like, I could document it on a citation.").

[33] *Id*. at 4:30:43; Def. Exh. R (File 3) at 4:30:36.

[34] Def. Exh. R (File 3) at 4:30:36–4:31:37.

[35] *Id*. at 4:31:37–45; Gov. Exh. 1 (File 10) at 4:31:41–54.

[36] *Compare* Gov. Exh. 1 (File 10) at 4:31:54 (Nesheiwat turning bodycam off), *with* Gov. Exh. 2 (File 13) at 4:35:10 (Nesheiwat turning bodycam on); *compare* Def. Exh. R (File 3) at 4:31:46 (Griffith turning bodycam off), *with* Gov. Exh. 3 (File 6) at 4:35:06 (Griffith turning bodycam on).

When the bodycams turned back on, Nesheiwat had resumed writing the citation and Griffith was still sitting in the passenger seat. Just as the audio kicks in 30 seconds later, Nesheiwat put down his clipboard and got out of the cruiser.[37] He told Morris he was going to write her a ticket for parking in the handicapped-parking spot. Nesheiwat then stated initially that he wasn't going to tow her car unless she wanted him to but that she couldn't drive it.[38] But he then backtracked, saying "I don't even know, I can't even leave it here."[39] Nesheiwat then told Morris that Griffith was "going to do a patdown for weapons" on the car—not of Morris[40]— explaining that, while he was writing her a ticket, he "wanted to make sure [he] didn't get shot at" because he didn't know either of them.[41] Morris responded that she didn't have a gun registered to her, and Nesheiwat replied, "I don't know that. . . . Do criminals have guns registered to them when they steal guns?"[42]

At this point, Griffith had also exited the cruiser, reached the driver's side of Morris's sedan, and is seen from Nesheiwat's bodycam opening the driver's door.[43] Griffith's bodycam shows him shining his flashlight throughout the front of the car and almost immediately finding a gas torch on the driver's seat.[44] Griffith then walked around the sedan and opened the front

---

[37] Gov. Exh. 2 (File 13) at 4:35:33–40.

[38] *Id*. at 4:35:40–52.

[39] *Id*. at 4:35:52–59.

[40] Nesheiwat likely clarified that the patdown would be of the car and not Morris because, in the midst of his sentence, she spread her hands at her sides and then placed them down, as if to prepare for a frisk or to show that she didn't have any weapons. *Id*. at 4:36:02–05.

[41] *Id*. at 4:36:00–11.

[42] *Id*. at 4:36:11–22.

[43] *Id*. at 4:36:15–20. About 12 minutes had passed at this point from the moment Nesheiwat's bodycam first turned on.

[44] Gov. Exh. 3 (File 6) at 4:36:13–4:37.

passenger door where Hicks had been sitting.[45]  As Griffith began the car patdown, Nesheiwat asked Morris and Hicks whether there was anything in their bags he "need[ed] to know about."[46] Hicks's responses are largely inaudible, but it is clear from Nesheiwat's replies that Hicks told him that he had a gun in his suitcase.[47]  At that point, Nesheiwat handcuffed Hicks's hands behind his back and called out to Griffith, who had just opened the sedan's passenger side door, that there was a "413"—meaning a gun—in the back.[48]  Griffith then opened the door to the backseat and found a revolver in the suitcase that Hicks had indicated.[49]

Two minutes later, Nesheiwat placed Hicks in the back of the cruiser.[50]  Nesheiwat then walked back around the cruiser towards Morris, who remained standing unrestrained in the same spot, and called for a tow truck on his radio.[51]  When Morris asked whether her car would be towed, Nesheiwat told her it would be because she couldn't drive it.  She protested, stating that Nesheiwat previously said he wouldn't tow the car.  He reiterated that he couldn't allow her to drive the car and pointed out that the Emerald Suites security had arrived.  Morris then asked whether her husband could come down and move the car, and Nesheiwat responded that he didn't have time to wait and again reiterated that she couldn't drive it.  Morris also requested that Nesheiwat move the car for her, but he informed her that Metro's policy didn't allow him to.[52]

---

[45] *Id*. at 4:37:00–08.

[46] Gov. Exh. 2 (File 13) at 4:36:30–35.

[47] *Id*. at 4:36:53.

[48] *Id*. at 4:36:53–4:37:21.

[49] Gov. Exh. 3 (File 6) at 4:37:21–4:38:32.

[50] Gov. Exh. 2 (File 13) at 4:40:12–35.

[51] *Id*. at 4:40:35–47.

[52] *Id*. at 4:40:48–4:41:20.

Nesheiwat then proceeded to complete the parking citation.[53]  Almost 35 minutes later,

Nesheiwat opened the cruiser's passenger seat where Hicks was sitting to make sure he was

wearing a seatbelt, but he then took Hicks out of the cruiser to search him because he hadn't

personally done so earlier.[54]

     Shortly after arresting Hicks, Griffith completed the arrest report on behalf of both

officers.  In discussing the officers' reasons for patting down Morris's sedan, Griffith cited to

Hicks's violent priors and (according to Griffith) the fact that Hicks, while standing in front of

the cruiser, "was displaying nervous behavior such as backing away from the patrol vehicle and

staring, fixating on the [sedan], blading off facing his hips towards the vehicle."[55]

     Hicks was eventually indicted in federal court on one count of being a felon in possession

of a firearm.[56]  The parties attempted to enter into a binding plea agreement that called for a

lenient sentence of time served.  Given Hicks's relatively lengthy and violent criminal history, I

found that this sentence was insufficient and rejected the binding plea.[57]  I therefore set an

expedited evidentiary hearing on Hicks's pending suppression motion, which was held on

June 17, 2019.[58]

---

[53] *Id*. at 4:41:38–4:44:15.

[54] Def. Exh. V (File 7).  During cross examination of Nesheiwat, Hicks's counsel stated that Griffith was the officer who pulled Hicks out of the cruiser to search him, but Nesheiwat eventually clarified that the voice on that bodycam video was his own.  And after hearing Nesheiwat testify for nearly two hours during the suppression hearing, I agree that it was his voice and that he was therefore the officer who searched Hicks *after* his arrest.

[55] ECF No. 24-1 at 6.

[56] ECF Nos. 1, 5.

[57] ECF No. 39.

[58] ECF No. 46.

**Discussion**

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."[59]  A warrantless search is thus presumed to be unreasonable unless it satisfies one of the "specifically established and well-delineated exceptions."[60]  For instance, under the automobile exception, "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."[61]  But in *Terry v. Ohio*,[62] the U.S. Supreme Court recognized that "the Fourth Amendment allows a properly *limited* 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime."[63]  To justify a so-called *Terry* stop, "an officer must have a reasonable suspicion of criminal activity based on 'specific and articulable facts and rational inferences from those facts.'"[64]  During such a stop, an officer may also "frisk" or "patdown" a suspect for weapons but only if he has a "reasonable suspicion that [the] suspect 'is armed and presently dangerous to the officer or to others.'"[65]  "A mere inchoate and unparticularized suspicion or hunch that a

---

[59] U.S. Const. amend. IV.

[60] *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)).

[61] *California v. Acevedo*, 500 U.S. 565, 580 (1991).

[62] *Terry v. Ohio*, 392 U.S. 1, 19 (1968).

[63] *Florida v. Royer*, 460 U.S. 491, 512 (1983) (emphasis added) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975)).

[64] *Id.* (brackets and ellipses omitted) (quoting *Terry*, 392 U.S. at 21).

[65] *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016) (quoting *Terry*, 392 U.S. at 24); *see also id.* ("A lawful frisk does not always flow from a justified stop.").

13

person is armed and dangerous does not establish reasonable suspicion, and circumstances suggesting only that a suspect would be dangerous *if* armed are insufficient."[66]

Hicks argues that the officers violated his Fourth Amendment rights at three separate stages of the stop: (1) initiating the stop and ordering him out of the car, (2) unnecessarily prolonging their investigation of the handicapped-parking violation, and (3) patting down the car without the requisite reasonable suspicion that it contained weapons. Because Hicks told Nesheiwat about the handgun in his suitcase only after Griffith began the patdown of Morris's car, if any one of these stages was constitutionally infirm, then Hicks's statement and the handgun must be suppressed as the "fruit of the poisonous tree."[67] And because each stage of the stop relies on a different Fourth Amendment tributary, I address each stage separately. I conclude by briefly addressing the factual ambiguity that prevents me from concluding that the officers would have inevitably discovered the handgun during an inventory search of Morris's car.

### A. The officers initiated a valid traffic stop and permissibly ordered Morris and Hicks out of the car.

Although the *Terry* stop stems from the scenario of a police officer briefly detaining a suspect on the street to investigate—based on reasonable suspicion—whether a crime is being committed, the Supreme Court quickly imported the doctrine to the traffic-stop context.[68] An officer must therefore have reasonable suspicion that a car's driver has violated a traffic law to

---

[66] *Id.* (internal quotation marks and citation omitted).

[67] *Wong Sun v. United States*, 371 U.S. 471 (1963).

[68] *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) ("[T]he usual traffic stop is more analogous to a so-called '*Terry* stop,' than to a formal arrest." (internal citation omitted)).

justify pulling the car over.[69]  And though the relevant portion of Hicks's motion addresses only

the constitutionality of being ordered out of Morris's car, his cross examination of Nesheiwat

was partially aimed at challenging whether the officers had reasonable suspicion to initiate the

stop in the first place.  For these arguments to be considered properly raised, Hicks should have

briefed them.  But because the legitimacy of the stop itself is fundamental to the Fourth

Amendment inquiry and the record was sufficiently developed during the hearing, I will first

address these foundational issues.

### 1.    The officers had reasonable suspicion that the car's driver was illegally parked in a handicapped-parking spot.

During Nesheiwat's cross examination, Hicks's counsel extensively asked him whether

he could see from the police cruiser if Morris's car lacked a handicapped placard *before* he

parked behind her car and thereby prevented Morris and Hicks from leaving.  The intended

implication is that the officers initiated the traffic stop without first having reasonable suspicion

that Morris had violated Nevada's handicapped-parking statute.  But even assuming that the

absence of a properly marked license plate alone doesn't justify an officer briefly detaining the

driver of a car parked in a handicapped-parking spot to check whether she alternatively has a

temporary placard,[70] Nesheiwat clarified that he believed he saw from his cruiser that a placard

was missing.  He therefore parked and approached the sedan to "confirm" its absence.

---

[69] *United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000) (clarifying that reasonable suspicion rather than probable cause is the standard for initiating a traffic stop); *see also Arizona v. Johnson*, 555 U.S. 323, 327 (2009) ("[I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.").

[70] To park in a handicapped-parking spot, a driver must have (1) a special license plate, (2) a temporary placard, *or* (3) a temporary sticker.  Nev. Rev. Stat. § 484B.467(5).

Hicks also cross examined Nesheiwat on whether the handicapped-parking sign in front of Morris's car gave appropriate legal notice that Morris had violated Nevada's handicapped-parking statute. Although the statute requires such a sign to read "Minimum fine of $250 for use by others,"[71] the sign present read "$100 to $1000 Fine If Used by Others," citing an outdated iteration of the statute.[72] Because the statute requires that a sign comply with the notice requirement for a person to be found guilty of a misdemeanor,[73] Morris may have been able to successfully challenge her parking ticket in court. But a traffic stop is still valid if it results from an officer's reasonable mistake about what the law requires and thus whether a person is violating it.[74] Here, any mistake by the officers here was reasonable. They saw a car parked in a spot designated as a handicapped one by a symbol on the asphalt[75] and with a sign. It was not unreasonable for the officers not to know or recall that the sign had to give a specified fine range or that the range listed on the sign was outdated. I therefore find that reasonable suspicion supported the traffic stop.

### 2. Because of the dangers a traffic stop poses, the officers justifiably ordered Hicks out of Morris's car.

Hicks acknowledges that police officers may, to ensure their own safety, order a passenger out of a car during a traffic stop.[76] He nonetheless argues that the officers "did not

---

[71] *Id.* § 484B.467(1)(b).

[72] Def. Exh. E.

[73] Nev. Rev. Stat. § 484B.467(5) ("A person shall not park a vehicle in a space designated for persons who are handicapped by a sign that meets the requirements of subsection 1 . . . unless the person is eligible to do so and the vehicle displays . . . ."); *id.* § 484B.467(10) ("A person who violates any of the provisions of subsections 5 to 9, inclusive, is guilty of a misdemeanor . . . .").

[74] *Heien v. North Carolina*, 135 S. Ct. 530, 534 (2014).

[75] Def. Exh. D.

[76] ECF No. 24 at 6–7.

have the authority to seize and question [him] absent reasonable suspicion or probable cause that he had committed a crime."[77]  Hicks contends that reasonable suspicion was lacking because it was Morris, as the car's driver, that would have been culpable for violating the handicapped-parking statute.

But Hicks misstates the law.  The Supreme Court has long "held that[,] during a lawful traffic stop[,] an officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk" or has committed a crime.[78]  Citing to the high rate of officers shot during traffic stops, the Court held in *Pennsylvania v. Mimms*, that, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."[79]  Two decades later in *Maryland v. Wilson*, the Court extended this rule to car passengers, finding that "the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger."[80]  Once "[o]utside the car," the Court reasoned, "the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment."[81]  This is the same explanation that both Nesheiwat and Griffith provided for why they ordered Morris and Hicks out of the sedan.

---

[77] *Id.* at 7.

[78] *Brendlin v. California*, 551 U.S. 249, 258 (2007) (citing *Maryland v. Wilson*, 519 U.S. 408, 554 (1997)).

[79] *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977).

[80] *Wilson*, 519 U.S. at 413.

[81] *Id.* at 414.

Hicks nonetheless attempted during the hearing to undermine the potential danger that the officers faced by analogizing the stop to writing a parking ticket for an expired meter. For instance, he elicited testimony from Nesheiwat that, had no one been in the car when the officers arrived, they would have simply left a ticket on the car's windshield. But the presence of two individuals during a traffic stop—regardless of the severity of the traffic law potentially violated—is the critical distinction that brings this stop within the ambit of *Mimms* and *Wilson*. As the Court explained in the latter case, "the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver."[82] This rationale applies in equal force to the stop here, which involved the officers approaching an unknown car with two adult occupants at night in a high-crime area. The Fourth Amendment therefore did not prohibit the officers from ordering Hicks out of the car.

Nor did the officers violate the Fourth Amendment by having Hicks stand in front of their cruiser while they investigated Morris's violation of the handicapped-parking statute—as he repeatedly implied during the hearing. In holding that a traffic stop invokes a passenger's Fourth Amendment rights, the High Court explained in *Brendlin v. California*, that "[i]t is . . . reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety."[83] And the Court found that, even when the police stop a car for a traffic violation, "the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously

---

[82] *Id.* at 414.

[83] *Brendlin*, 551 U.S. at 258.

likely to prompt an objection from the officer that no passenger would feel free to leave in the first place."[84]  Hicks has not cited—nor have I found—any authority that suggests that, contrary to these "reasonable" expectations, an officer may not briefly detain a passenger while investigating whether the driver violated a traffic law.  Rather, "*Brendlin* held that a passenger is seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.'"[85]  Directing that passenger to remain standing in a particular position until the investigatory stop is complete is thus the logical extension of the officer-safety rationale underpinning *Mimms* and its progeny.  And though Hicks also intimated during the hearing that the officers could have simply allowed him to leave the Emerald Suites parking lot while they investigated Morris, doing so would have required allowing Hicks to retrieve his suitcase, thus giving him access to Morris's car and undermining the reason the officers ordered him out of it.  Accordingly, the officers' decision to initiate the traffic stop, along with their order that Hicks exit Morris's car, was constitutionally sound.

### B.      The officers did not prolong the traffic stop.

The Supreme Court recently clarified the framework for assessing a stop's length in *Rodriguez v. United States*, holding that a "stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.  A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation."[86]  In *Rodriguez*, an officer pulled a car over for veering into the shoulder of the

---

[84] *Id*.

[85] *Johnson*, 555 U.S. at 332 (alteration in original) (quoting *Brendlin*, 551 U.S. at 263).

[86] *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (alterations in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

highway.[87]  After obtaining the driver's license and registration, the officer ran a records check on him and, after then returning to the driver's car, asked the passenger for his license and "where the two men were coming from and where they were going."[88]  Only after also running a records check on the passenger did the officer begin writing the driver a "warning ticket."[89]  The officer then gave the driver the ticket and also verbally warned him.[90]  By that point, the stop had lasted just under half an hour,[91] and the officer had, by his own account, "got[ten] all the reason for the stop out of the way" and taken "care of all the business."[92]  But the officer still did not permit the car to leave.  He instead waited several more minutes for a second officer to arrive and then walked his drug-sniffing dog around the car, revealing the presence of drugs.[93]

In finding that the officer impermissibly prolonged the stop after issuing the ticket, the Court first acknowledged that the police may "conduct certain unrelated checks during an otherwise lawful traffic stop."[94]  These "ordinary inquiries incident to the traffic stop"[95] include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[96]  The Court explained that an officer may take such "negligibly burdensome precautions in order to complete

---

[87] *Id.*

[88] *Id.* at 1613.

[89] *Id.*

[90] *Id.*

[91] *Compare id.* at 1612 (stating that the stop began "[j]ust after midnight"), *with id.* at 1613 (stating that, "[b]y 12:27 or 12:28 a.m.," the officer had finished warning the driver).

[92] *Id.* at 1613 (alterations omitted).

[93] *Id.*

[94] *Id.* at 1615.

[95] *Id.* (alteration omitted) (quoting *Caballes*, 543 U.S. at 408).

[96] *Id.*

his mission safely" and that this "safety interest stems from the mission of the stop itself."[97]  But "[o]n-scene investigation into other crimes . . . detours from that mission" and cannot be justified absent independent reasonable suspicion.[98]  Walking the drug dog around the car, the Court found, was "not fairly characterized as part of the officer's traffic mission" but rather aimed at detecting additional crime.[99]  The Court held that "[t]he critical question" in determining whether the dog sniff was permissible was "not whether the . . . sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'"[100]

Hicks argues that the officers here impermissibly prolonged the length of the traffic stop during their investigation by (1) conducting a patdown of Morris's car and (2) questioning him and investigating his background.  I address these issues separately.

> **1.    The scope of the traffic stop included writing Morris a ticket, which the officers were still in the process of completing when they decided to first pat down her car.**

Hicks contends that, by the point the officers decided to frisk Morris's car for weapons, they had already exceeded the scope of their investigation and therefore prolonged the stop.  But Hicks makes inconsistent arguments as to what that scope was.  As discussed above, the impetus for the stop was the officers' reasonable suspicion that Morris had unlawfully parked in a handicapped-parking spot.  Although Nesheiwat almost immediately confirmed this suspicion upon speaking to Morris, Hicks concedes that "a reasonable investigation into the parking violation" didn't stop there because the officers were also permitted to "check[] Ms. Morris's

---

[97] *Id*. at 1616.

[98] *Id*.

[99] *Id*. at 1615.

[100] *Id*. at 1612.

driver's license" and "run[] a records check against her . . . ."[101]  But Hicks also argues that the officers unnecessarily detained him and Morris after they determined that she was illegally parked because Nesheiwat had decided at that point not to issue Morris a ticket.  In support, he points to the exchange between Nesheiwat and Morris after they first walked from her sedan to the cruiser and she complained about being given a "hard . . . time," to which Nesheiwat responded, "[I]f you'd like, I can give you a ticket."[102]  This exchange occurred, however, outside the cruiser while Griffith was running a records search on both Morris and Hicks.  So, even though Nesheiwat had not yet decided to issue a ticket, his partner was still conducting the type of "ordinary inquiries incident to the traffic stop" that *Rodriguez* reiterated were permissible.[103]  And Nesheiwat also testified that he decided to issue Morris a ticket only after discovering she had a suspended license[104] because she therefore couldn't legally move the car from its spot.[105]  Accordingly, the results of the records search were part of the officers'

---

[101] ECF No. 44 at 4.

[102] ECF No. 44 at 4–5 n.3; Gov. Exh. 1 (File 10) at 4:25:30–4:26:34.

[103] I address below the issue of whether the officers were permitted to investigate Hicks's criminal history.

[104] It is not clear from the record when the officers *first* learned that Morris's license was suspended.  Griffith, who was ran the records search on both Morris and Hicks early in the stop, testified that he discovered Morris's prior narcotics arrests *and* that her license was suspended.  Nesheiwat then took Morris aside, asked if she had drugs in her car, and said that he would check whether she had a valid license.  He testified that he then ran a DMV search that showed it was suspended.  Neither side reconciled this testimony during the hearing, and it is not clear if a records search shows the status of a suspect's license.  But it is possible that the initial records search revealed some irregularity with Morris's license and that Nesheiwat merely confirmed later through a more thorough DMV search that it was suspended.  But even if Griffith's initial records search was only meant to (or capable of) determining whether Morris had outstanding warrants or a criminal history, the Supreme Court confirmed that such "unrelated checks" are permitted during a traffic stop.  *Rodriguez*, 135 S. Ct. at 1615.

[105] This explanation is credible because Nesheiwat began writing the ticket immediately after discovering through the DMV records search that Morris's license was suspended and confirming her full name with her.

determination of whether a citation was warranted, and running the search was therefore within the scope of the officers' investigation.

There is also no merit to Hicks's argument that the traffic stop's mission had concluded by the point that Nesheiwat announced to Morris that he was going to issue her a ticket and thus before the patdown of her car had commenced.[106] *Rodriguez* explicitly defines the scope of a traffic stop as including "the time reasonably required to complete the mission *of issuing a ticket for the violation*."[107]  Nesheiwat had only begun filling out the ticket when the patdown started,[108] and he decided to frisk the car—according to his statement on the bodycam and his later testimony—because he was writing the ticket and thus extending the stop and amplifying its inherent dangers.[109]  And, unlike the use of a drug-sniffing dog in *Rodriguez*, a patdown—whether of a suspect of her car—is fairly characterized as part of an officer's traffic mission if warranted under the circumstances.  So, if reasonable suspicion supported Nesheiwat and Griffith's decision to frisk Morris's car—which I address below—then doing so did not impermissibly prolong the traffic stop.

---

[106] ECF No. 44 at 5–6.

[107] *Rodriguez*, 135 S. Ct. at 1612 (emphasis added) (alteration and quotation marks omitted).

[108] Indeed, Nesheiwat spent at least three minutes completing the ticket after handcuffing Hicks and placing him in the back of the cruiser.  Def. Exh. 2 (File 13) at 4:41:35–4:44:13.

[109] *See* Gov. Exh. 2 (File 13) (I'm going to write you a ticket, okay, for parking here, okay. . . . . [M]y partner's going to do a patdown for weapons okay because while I'm releasing you—not on you, on your car—okay, because while I'm writing you a ticket on your car I want to make sure I'm not going to get shot at because I don't know either one of you.").

2. **The officers' inquiry into Hicks's criminal history and gang affiliation ran parallel to and did not hinder their investigation of Morris's handicapped-parking violation and suspended license.**

Hicks also challenges the fact that the officers questioned him during the stop about where he was moving to and his gang affiliation.[110]  Though this briefed argument addresses only whether it was permissible for them to question him at all, it was evident from Hicks's cross examination of the officers that he is also more broadly asserting that the process of questioning him and running a records search on him impermissibly prolonged the stop.  I address these questions together because they involve intertwined precedent that determines *what* information the police can request from a car passenger and *when* they can request it.

In *United States v. Diaz-Castaneda*, the Ninth Circuit held that "[t]he police may ask people [including passengers in cars] who have legitimately been stopped for identification without conducting a Fourth Amendment search or seizure."[111]  In a subsequent unpublished disposition, the court cited to *Diaz-Castaneda* in concluding that "[a] police officer may also lawfully conduct a [records] check on the passenger using his or her identification."[112]  Although the Ninth Circuit did not elaborate on the rationale for permitting a search of a passenger's background, the Fourth Circuit has explained that, "tak[ing] such measures with respect to both the driver and passengers of a stopped vehicle [helps] ensure officer safety."[113]  In other words, the same safety interest that permits an officer to conduct "ordinary inquiries incident to the traffic stop" as to the driver also applies to the passenger.

---

[110] ECF No. 44 at 8–10.

[111] *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007); *see also United States v. Landeros*, 913 F.3d 862, 870 (9th Cir. 2019) (clarifying that *Diaz-Castaneda* also applies to passengers).

[112] *United States v. Evans*, 445 F. App'x 29, 31 (9th Cir. 2011).

[113] *United States v. Hill*, 852 F.3d 377, 383 (4th Cir. 2017).

Earlier this year, however, the Ninth Circuit posed—but ultimately left unanswered—the question of whether *Diaz-Castaneda* remains good law after *Rodriguez.* In *United States v. Landeros*, a police officer pulled over a car for speeding and asked to see the driver's license, as well as identification for the two backseat passengers because they appeared to be underage and he suspected that they were out past curfew and drinking underage.[114] After the officer confirmed that both passengers were adults, he asked the front-seat passenger for his ID.[115] The officer later testified that he didn't think this passenger—who was later identified as Landeros—was a minor but asked for IDs from everyone in a car during a traffic stop as a matter of course.[116] Landeros refused to provide an ID or even his name, so the officer called for backup.[117] Another officer arrived and also unsuccessfully ordered Landeros to provide ID. Both officers then repeatedly ordered Landeros to exit the car, which he eventually did, and one of the officers later discovered bullets in Landeros's pocket during a consensual search.[118] After Landeros was arrested and indicted for being a felon in possession of ammunition, he moved to suppress evidence from the search, arguing that it was obtained after the traffic stop was impermissibly prolonged.

Applying the *Rodriguez* framework, the Ninth Circuit found that "the several minutes of additional questioning to ascertain Landeros's identity was permissible only if it was (1) part of the stop's 'mission' or (2) supported by independent reasonable suspicion."[119] The court then

---

[114] *Landeros*, 913 F.3d at 864.

[115] *Id.* at 865.

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.* at 687–68.

concluded that "[a] demand for a passenger's identification is not part of the mission of a traffic stop."[120]  Although recognizing that *Rodriguez* reiterated that officers may, in the interest of their own safety, run a records check on a driver, the court found that "knowing Landeros's name would not have made the officers any safer."[121]  The Ninth Circuit reasoned that "[e]xtending the stop, and thereby prolonging the officers' exposure to Landeros, was, if anything, 'inversely related to officer safety.'"[122]  And near the end of its decision, the court acknowledged that *Diaz-Castaneda* "permits police to '*ask* people [including passengers in cars] who have legitimately been stopped for identification without conducting a Fourth Amendment search or seizure.'"[123]  The Ninth Circuit nonetheless concluded that it "need not resolve whether that precedent remains valid after *Rodriguez*.  Regardless of whether the *first* request for Landeros's identification was lawful, law enforcement's refusal to take 'no' for an answer was not."[124]

Hicks briefly cites to *Landeros* in arguing that the officers here had "no reason" to ask him to identify himself, "let alone look into his background."[125]  But although *Landeros* left some tension with *Diaz-Castaneda* unresolved, the two cases are reconcilable.  *Landeros* emphasized that the court's prior precedent hinged on an officer *asking* a passenger for his ID—whereas a driver, reasonably suspected of violating a traffic law, may be compelled to provide his license as proof of being permitted to drive.  In contrast, the officers in *Landeros* ordered the front-seat passenger to provide ID without reasonable suspicion that he committed any crime.

---

[120] *Id*. at 688.

[121] *Id*.

[122] *Id*. (quoting *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015)).

[123] *Id*. at 870 (emphasis in original) (quoting *Diaz-Castaneda*, 494 F.3d at 1152).

[124] *Id*. (emphasis in original).

[125] ECF No. 44 at 9.

And critically, after Landeros lawfully refused to provide his ID, the officer continued to detain him (and the rest of the car's occupants) by calling for backup and ordering Landeros out of the car. Although it is not clear from the opinion whether the initial officer had ever decided to issue the driver a speeding ticket or finished writing one, the officer's interactions with Landeros were clearly tangential to the traffic stop's mission—investigating the driver's traffic violation—and thus impermissibly prolonged the stop. After all, "the critical question is whether the [records] check [on the passenger] prolongs—i.e., adds time to—the stop."[126] I thus do not read *Landeros* to categorically prohibit officers from *requesting* a passenger's ID during a traffic stop without reasonable suspicion that he has committed a crime.

And the traffic stop here is distinguishable from *Landeros* in two important respects. First, Griffith testified that he asked for Hicks's ID, and because Hicks didn't have a state-issued ID with him, he simply provided the officer his name. Hicks has not asserted that Griffith attempted to coerce him into identifying himself by, for instance, threatening to arrest him. Most passengers would, of course, still feel compelled to comply. But *Landeros* hinged on the fact that the officer prolonged the stop when the passenger refused to identify himself—not the fact that the officer asked in the first place.

Second, the record reveals that any investigation into Hicks's background and criminal history ran parallel to the investigation of Morris's handicapped-parking violation and thus never prolonged the traffic stop's mission. As both officers testified and the bodycam footage shows, Nesheiwat and Griffith dealt with Morris and Hicks separately. While Nesheiwat was asking Morris basic traffic-stop questions—who she was, whether she was allowed to park in the spot, and where she was heading—Griffith was separately asking similar questions of Hicks.

---

[126] *Landeros*, 913 F.3d at 866 (quoting *Evans*, 786 F.3d at 786).

The only point when there is any convergence of one officer dealing with both Morris and Hicks is when Griffith began running records checks on both of them inside the cruiser. During the hearing, Hicks asserted that, because the computer printout of what searches Griffith ran isn't available,[127] it is possible that Griffith ran the records search on Hicks first, thus prolonging the time it took to search Morris's records. But even after *Rodriguez*, the Fourth Amendment is not as persnickety as Hicks intimates. In *Rodriguez* itself, the officer went back to the stopped car, asked for the passenger's ID, and ran a records search on him only after having completed a records search on the driver. Yet the only conduct that the Supreme Court identified as prolonging the stop was the first officer continuing to detain the car's occupants until a second officer arrived and the drug-sniffing dog circled the car.[128]

Here, Nesheiwat's bodycam footage shows that Griffith entered the cruiser to run the records searches at timestamp 4:24:28, Nesheiwat provided him Morris's full name almost 30 seconds later, and at 4:27:40, Griffith handed Nesheiwat a notepad after the latter officer asked, "everybody good?"[129] The reasonable inference is that the notepad informed Nesheiwat about the results of Morris's records search, including her narcotics arrest, because Nesheiwat then immediately asked Morris to follow him back to her car, where he asked if there were drugs in the car.[130] Any transition between Griffith running a search on Hicks and then on Morris appears seamless, and I see no evidence that the search was impermissibly prolonged at this point.

---

[127] *See supra* note 16.

[128] *Rodriguez*, 135 S. Ct. at 1613. This fact also cuts against the conclusion that *Rodriguez* categorically prohibits officers from requesting a passenger's ID during a traffic stop absent reasonable suspicion that he has committed a crime.

[129] Gov. Exh. 1 (File 10).

[130] *Id*. at 4:27:45–57.

Finally, the questions that the officers separately asked of Hicks occurred parallel to and independent of some other portion of the investigation of Morris's parking violation and suspended license. Nesheiwat asked Hicks about where he was moving to while Griffith ran the records searches inside the cruiser. And Griffith asked him about his gang affiliation and tattoo while Nesheiwat was receiving the results of the DMV search and informing Morris that her license was suspended. It is therefore evident that neither question prolonged the traffic stop.

And though Hicks also objects to the fact that the officers asked him these questions at all, I do not read *Rodriguez* or *Landeros* to prohibit officers from asking passengers questions— even ones outside the scope of the traffic stop's mission—as long as that process does not prolong the stop. Indeed, the officer in *Rodriguez* asked the passenger "where the two men were coming from and where they were going"[131]—which is akin to asking Hicks, who reported he was leaving the Emerald Suites that night, where he was moving to. And asking someone detained during a traffic stop about his gang affiliation is fairly characterized as a safety precaution rather than as an impermissible attempt to detect crime absent reasonable suspicion, especially in an area designated as "high crime" in part because of its gang violence. Accordingly, I find that the officers were permitted to run a records search on Hicks and ask him background questions and that none of their actions prolonged the investigation into Morris's parking violation.[132]

---

[131] *Rodriguez*, 135 S. Ct. at 1613.

[132] The government also argues that "the officers had reasonable suspicion to believe another crime was or was going to be[] committed" and that the officers therefore could have prolonged the search. ECF No. 41. at 4. But the government never specifies what this additional crime was, and Nesheiwat testified that he and Griffith were only ever investigating Morris's handicapped-parking violation and suspended license. And because I find that the search wasn't prolonged, no added reasonable suspicion is necessary to conclude that the stop was constitutionally sound.

29

## C. Reasonable suspicion supported the officers' patdown of Morris's car.

In *Michigan v. Long*, the Supreme Court extended the concept of a *Terry* frisk to cars.[133] It held "that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."[134] The Court applied this new rule to a case in which officers stopped to investigate after they saw a speeding car swerve into a ditch after driving "erratically" in a rural area at night.[135] After the driver voluntarily exited his car, the officers saw through the open car door a hunting knife on the floorboard of the driver's seat.[136] After a patdown of the driver revealed no weapons on him, one of the officers began shining his flashlight in his car to search for weapons. The officer saw something protruding from the armrest, opened it, and discovered a pouch of marijuana.[137]

In ultimately upholding the patdown of the car, the Court rejected the Michigan Supreme Court's conclusion that "it was not reasonable for the officers to fear that [the driver] could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile."[138] The

---

[133] *Michigan v. Long*, 463 U.S. 1032, 1046 (1983) ("Although *Terry* did involve the protective frisk of a person, we believe that the police action in this case is justified by the principles that we have already established in *Terry* and other cases.").

[134] *Id.* at 1049 (quoting *Terry*, 392 U.S. at 21).

[135] *Id.* at 1036.

[136] *Id.*

[137] *Id.*

[138] *Id.* at 1051.

Court reasoned that, "[j]ust as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in [the driver's] position break away from police control and retrieve a weapon from his automobile."[139]  And "if the suspect is not placed under arrest," the Court continued, "he will be permitted to reenter his automobile, and he will then have access to any weapons inside."[140] "Or . . . the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons."[141]

The government contends that several facts during this stop gave rise to reasonable suspicion that there was a weapon in Morris's car and that she or Hicks posed a potential danger to the officers, and I begin with those that I find validly weigh in favor of the patdown.  First, the stop occurred at night in a high-crime area prone to guns.  Griffith testified that he recovered about 34 guns within a 6-month period of stopping Hicks.  Second, by the time of the frisk, the officers knew that both of the car's occupants had "priors": Hicks for robbery and battery with a deadly weapon—two crimes that are usually violent—and Morris for narcotics.  Although Hicks highlighted during the hearing that the officers could not recall if his records search specified whether these priors were arrests or convictions, the distinction makes little difference in assessing the risk a suspect poses.  The officers also knew that Hicks was, or at least had been, a member of a local gang.

The government also points to Hicks's "nervous behavior" that Griffith reported he observed: "fixating" on the sedan, facing his hips towards it, and backing away from the officers'

---

[139] *Id.*

[140] *Id.* at 1052.

[141] *Id.*

cruiser. Hicks cross examined both officers extensively about these observations, contending that they are unsupported by the bodycam footage. After many re-watchings, I agree that the footage never shows Hicks moving his hips or backing away. The caveat to this of course is that the bodycam footage doesn't show the entire interaction between the officers and Hicks, and Griffith didn't have his bodycam on during his initial interaction with Hicks before running the records search. The footage also doesn't reveal Hicks "fixating" on the sedan, but there are a few instances while he is in front of the hood with Morris and Griffith when it appears that Hicks is slowly cocking then turning his head towards the sedan, looking past Morris, and resting his gaze on the car.[142] It is difficult to make out these subtle gestures from a bodycam, especially involving footage at night with police lights flashing. And when Griffith spoke to Hicks by the cruiser's hood, his bodycam was not always pointed at Hicks's face. Ultimately, I find that both officers testified credibly and observed nervous behavior from Hicks—especially glances towards Morris's car—that are difficult to perceive on the bodycam. But I assign this nervousness only slight weight because it was not as pronounced as the arrest report represented.

Both sides have also made much of the fact that Hicks told Nesheiwat that he was moving to a Siegel Suites on Paradise Road and Convention Center Drive, to which Nesheiwat replied, "There's nothing there." But it turns out that there is a Siegel Suites under three-tenths of a mile from that intersection.[143] Nesheiwat appeared surprised by this fact on the stand, explaining that the Siegel Suites is West of Paradise Road and thus outside the area he and Griffith patrol. It is thus likely that Nesheiwat was simply mistaken when he told Hicks there

---

[142] See, e.g., Gov. Exh. 1 (File 10).

[143] The government accepted Hicks's offer of proof on this issue during the hearing.

was nothing there.  Regardless, this fact has no probative value in my mind as to whether the officers reasonably suspected that there was a weapon in Morris's car.

On the other side of the scale, Hicks argues that the officers' failure to frisk either Morris or himself for weapons cuts against the conclusion that the officers reasonably suspected they were armed.  Hicks doesn't directly come out and assert that he wasn't frisked by Griffith but rather appears to be pointing to a lack of evidence that Griffith did so.  During the hearing, Griffith couldn't remember whether he frisked Hicks but testified that he likely would have, given their presence in a high-crime area.  Although Hicks pointed out during the hearing that Griffith didn't mention a patdown of either suspect in his report, Nesheiwat testified that he doesn't always include that detail in his own reports.  And the fact that Nesheiwat later searched Hicks after he was handcuffed and placed in the back of the cruiser has little bearing on whether Griffith frisked him at the beginning of the stop, as a search incident to a lawful arrest is more invasive than the limited patdown for weapons that *Terry* permits.

But even if Griffith had decided not to patdown Hicks at the beginning of the stop, this would shed little light on whether it was reasonable to patdown Hicks or the car by the end of the stop, after the officers had learned about Hicks's priors and gang affiliation.  I ultimately find that it is unclear whether Griffith ever frisked Hicks, so there is little to weigh against the reasonableness of the car patdown.  As for Morris, Nesheiwat testified that he did not pat her down for weapons after she exited the car or at any point during their interaction because she was wearing a "tight" dress and boots, and he would have therefore seen a bulge if she was

carrying a gun.[144]  This explanation is credible and reasonable, and I therefore don't place any weight on the fact that Nesheiwat decided not to frisk her.

On balance, there is little to weigh against the fact that the stop occurred in a high-crime area and that the officers quickly discovered that both Morris and Hicks had, at the minimum, been arrested for drug and violent crimes.  After also considering that Hicks admitted to being a gang member and that he displayed some nervous behavior, including glancing over at Morris's car, I find that the officers reasonably suspected that there may be a weapon in the car and that Morris or Hicks might be dangerous.  *Long* thus permitted the officers to patdown the car for weapons to ensure that neither Morris nor Hicks had access to one while the officers wrote Morris a ticket.

\* \* \*

Because every stage of the traffic stop complied with the Fourth Amendment, there is no basis to suppress evidence of Hicks's statement that he had a gun in his suitcase in the backseat of Morris's car or the gun itself.

### D.     The record is not sufficiently developed to conclude in the alternative that the officers would have inevitably discovered Hicks's gun in an inventory search.

The government argues in the alternative that, even if any stage of the stop was unconstitutional, suppression is unwarranted because the gun would have been inevitably discovered.  It contends that, because Morris's car was illegally parked and neither she nor Hicks had a valid driver's license, the car would have been towed and the gun would have therefore been discovered during an inventory search.  Under the inventory-search exception to Fourth

---

[144] Nesheiwat turned on his bodycam only after he began speaking with Morris, so neither their *initial* interaction nor Griffith and Hicks's interaction in the background was captured on camera.

Amendment's warrant requirement, officers may "impound and search a motor vehicle so long as they do so in conformance with the standardized procedures of the local police department and in furtherance of a community caretaking purpose . . . ."[145]

Hicks included copies of Metro's towing and car-search policies in his exhibit binder, but neither side moved to admit them into evidence. And although Griffith testified that Metro's policy directs a car to be towed if it is illegally parked and no licensed driver is present to move it, there was no evidence at the hearing about how this policy extends to personal items in the car, including anything belonging to a passenger. So, if Hicks had never revealed that there was a gun in the backseat of Morris's car and thus never been arrested, it is unclear whether he would have been allowed under Metro's policy to leave with his suitcase without the officers first searching it. I therefore cannot determine on this record whether the officers would have inevitably discovered Hicks's gun.

## Conclusion

Under longstanding Supreme Court precedent, police officers may, in order to ensure their own safety, order passengers out of a car during a traffic stop, even absent reasonable suspicion that the passenger committed any crime. The officers also did not impermissibly prolong the traffic stop by running a records search on Hicks and asking him about where he was moving to and his gang affiliation; this inquiry ran parallel to and did not hinder the traffic stop's mission of investigating Morris illegally parking in a handicapped-parking spot. Finally, the officers reasonably suspected that there may have been a weapon in Morris's car and that she or Hicks may have been dangerous based on their presence in a high-crime area, their prior arrests,

---

[145] *United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018).

and Hicks's gang affiliation.  Accordingly, IT IS HEREBY ORDERED that Hicks's motion to suppress **[ECF No. 24] is DENIED**.

Dated: July 5, 2019

_____
U.S. District Judge Jennifer A. Dorsey